UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

AUTUMN (BRIAN) RUBINO,      : CIVIL ACTION NO. 3:18-CV-1211
                            :
        Plaintiff,          : (JUDGE MARIANI)
                            :
        v.                  :
                            :
LACKAWANNA COUNTY, et al.,  :
                            :
        Defendants.         :
                            :

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is Defendants Correctional Care, Inc. a/k/a Correctional Care, PC's and Dr. Edward Zaloga's Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56 (Doc. 48).  With the Motion, Defendants Correctional Care, Inc. ("CCI") and Zaloga ("Defendants") seek summary judgment in their favor on all remaining claims against them contained in Plaintiff's Complaint (Doc. 1).  Plaintiff filed the Complaint following a four-month incarceration at Lackawanna County Prison based on the denial of medication she had been prescribed to treat gender dysphoria. (*Id.* ¶¶ 28-57.)  For the reasons that follow, Defendants' Motion will be granted in part and denied in part.

### II. BACKGROUND

Plaintiff's claims against Defendants CCI and Zaloga arise from events which occurred while Plaintiff was incarcerated at the Lackawanna County Prison beginning on

January 9, 2018, as both a pretrial and post-trial detainee.[1]  (Doc. 1 ¶ 2.)  Prior to her

incarceration, Plaintiff alleges that she had been diagnosed with gender dysphoria by

counselor Susan Decker in 2017 and was subsequently treated based on that diagnosis by

CRNP Lorraine Bock at Alder Health Services.  (Doc. 63 at 6 (citing Pl.'s Dep. (Pl.'s Ex. A)

at 22, Doc. 62-1).)  She states that hormone therapy began in approximately July 2017.  (*Id.*

(citing Pl.'s Dep. at 33-34).)   Plaintiff explains that she is a

> transgender female who was born with male genitalia and given the name Brian
> Rubino at birth. Plaintiff suffers from Gender Dysphoria. (Exhibit G at 3).
> Gender Dysphoria is a psychiatric diagnosis under the DSM V in which a
> person experiences distress because the gender that they were assigned at
> birth does not match the gender with which they identify. (Exhibit B at 6, p. 24;
> Exhibit G at 1). "Gender identity disorder" and "Gender Dysphoria" are two
> names for the same condition. (Exhibit B at 11. p. 44, Exhibit D at 135). Gender
> Dysphoria must be diagnosed by a mental health professional.
> (Exhibit D at 16). However, Gender Dysphoria is required to be treated both
> psychiatrically and physically. (Exhibit B at 8-9, pp. 32-33; Exhibit D at 15).
> Treatments include, but are not limited to, hormone therapy, counseling, and
> surgery. (Exhibit B at 9, p. 33). Medical doctors, rather than mental health
> professionals, provide the hormone therapy and surgery once a diagnosis is
> made.  Treatment for Gender Dysphoria is medically necessary. (Exhibit C at
> 5, p. 20; Exhibit D at 19; Exhibit G at 2). Gender Dysphoria is a serious medical
> need, and the alteration of treatment can cause physiological changes and
> psychological harm. (Exhibit G at 2-3). Specifically, the cessation of hormones
> can be devastating to a patient. (Exhibit G at 2).

(Doc. 63 at 5.)

At the time of her incarceration, Plaintiff told Lackawanna County medical personnel

that she was transitioning from male to female.  (*Id.* at 6 (citing Zaloga Dep. (Pl.'s Ex. B) at

---

[1] Plaintiff does not elaborate on her status.  (*See* Doc. 78 at 17.)

50, Doc. 62-1; Ex. H at 024, Doc. 62-8).)   Plaintiff also told medical personnel that she had been taking prescribed hormone medications and requested that they be continued.  (*Id.*)

After Plaintiff again requested the hormone medications on January 13, 2018, CRNP Anthony Iannuzzi noted that Plaintiff had been prescribed Estardiol and Aldacterone for transitioning and he requested hormone medication for her.  (Zaloga Dep. 41:3-9, Doc. 63-2.)  Dr. Zaloga overruled CRNP Iannuzzi's order, noting that "[t]hese are non-life-sustaining medications which have not been FDA approved for the requested purpose whose risks of serious and potentially fatal side effects far outweigh any subjective benefits."  (*Id.* 42:7-15.)

On January 15, 2018, Plaintiff submitted an inmate request form, which she identified as a "grievance", stating that "I was turned down by doctor to getting my hormones Estroden [sic]1.5 mg as required by my Doctor Lorraine Brock Alder Health Services.  I am federally have the fight to continue my treatment."  (Doc. 49-2 at 2; Doc. 49 ¶ 5; Doc. 62 ¶ 5.)  The request/grievance was forwarded to the Medical Department on January 19, 2018, and responded to on January 29, 2019.  (Doc. 49 ¶ 50; Doc. 62 ¶ 50.)  The response states:

1. Estrogen is not "required," you <u>want</u> it; you don't <u>need</u> it.

2. Lorraine Brock is <u>not</u> a doctor.

3. You don't have the "right" to elective treatment.

4. In my professional medical opinion, the risks far outweigh any subjective benefits.

(Doc. 49-2 at 2.)

Plaintiff submitted a second inmate request form on January 15, 2018, again asking to be given hormone medication.  (Doc. 49 ¶ 7; Doc. 62 ¶ 7.)  In his January 23, 2018, response, Dr. Zaloga stated that, in his professional medical opinion, "the risks of serious adverse effects, including possible stroke & death, far outweigh any subjective benefit [and] [e]strogen is not F.D.A. approved for this purpose, therefore it would be considered experimental."  (Zaloga Dep. 42:11-14, Doc. 62-2; *see also* Doc. 49 ¶ 9; Doc. 62 ¶ 9.)  Although Plaintiff agrees that this is Dr. Zaloga's response to his request, and that the use is not F.D.A. approved, she asserts that "the medications are ordinarily used as off-label uses to treat gender-dysphoria in the medical field."  (Doc. 62 ¶ 9 (citing Zaloga Dep. at 42-43, Doc. 62-2; Iannuzzi Dep. (Pl.'s Ex. D) at 133, Doc. 62-4; Fleetman Dep. (Pl.'s Ex. F) 17:62-63, Doc. 62-6).)

On January 25, 2018, Plaintiff submitted another inmate request form, stating that she wanted to see "the head doctor of this prison about not giving me my estrogen and spirolactone or I will report this to my federal PD and take it to the court."  (Doc. 49-4 at 2.) The response stated "1. Previously asked & answered.  There is nothing to talk about[.]  2. Proceed as you feel appropriate."  (*Id.*)

Defendants requested and received records from previous treating providers.  (Doc. 49 ¶ 12; Doc. 62 ¶ 12.)  Geisinger records did not include an evaluation or diagnosis of gender dysphoria.  (Doc. 49 ¶ 12; Doc. 62 ¶ 12.)  However, Plaintiff asserts that his last treatment at Geisinger was on April 3, 2017, and his subsequent treatment at Alder Health

Services is where she was diagnosed and began hormone therapy treatment. (Doc. 62 ¶

12 (citing Bock Dep. (Pl.'s Ex. E) at 28, 41, Doc. 62-5; Ex. H at 117-118, Doc. 62-8).) She

further asserts that CVS Pharmacy confirmed the valid prescriptions for the hormone

medications. (*Id.* (citing Ex. H at 009).)

Alder Health records "initially include the following 'problems': disorder of the

endocrine system, schizoaffective disorder, bipolar disorder, developmentally disabled, and

tachycardia." (Doc. 49 ¶ 16 (citing Defs.' Ex. F, Doc. 48-6).) Defendants add that

17. The Alder Health records also note prescriptions for, inter alia, hormone treatment medications estradiol and spironolactone. *Id.*

18. The records show that Plaintiff was first seen at Alder Health on November 22, 2016. *Id.*

19. At that time she was seen by Nurse Practitioner Lorraine Bock. *Id.*

20. The reason for visit section of the note states that "Pt is here for HRT to transition from Male to Female. States has a therapist named Susan Decker in Williamsport at Diakon. We have not gotten any information from her yet." *Id.*

21. At the end of the visit, Plaintiff was instructed to "contact therapist & get letter. Needs to begin living in his preferred gender." *Id.*

22. Plaintiff was diagnosed, at that time, with a disorder of the endocrine system, for which she was prescribed estradiol and prolactin. *Id.*

23. Plaintiff was next seen at Alder Health on May 8, 2017, for another appointment with Lorraine Bock. *Id.*

24. The reason for the visit was "gender identity" and the Assessment and Plan section of the note stated "Gender Dysphoria." *Id.*

25. The records for this visit also included a letter from Diakon Family Services, signed by Susan Decker, LPC, noting that Plaintiff suffers from a "moderate

intellectual disability" and that she is "eager to initiate testosterone therapy in order to begin gender reassignment." *Id.*

(Doc. 49 ¶¶ 17-25.)

Plaintiff points to six instances in the Alder Health records where gender dysphoria or gender identity disorder is listed as a diagnosis or reason for treatment.[2]  (Doc. 62 at 16 (citing Pl.'s Ex. H at 111, 116, 118, 119, 120, 121.)  Plaintiff summarizes the Alder Health records as showing that the first diagnosis of gender dysphoria was made on March 3, 2016, by counselor Susan Decker at Diakon Family Life Services and CRNP Bock herself rendered the diagnosis.  (Doc. 63 at 9 (citing Zaloga Dep. at 78, Doc. 62-2; Bock Dep. at 28, 41, Doc. 62-5).)  At her deposition, CRNP Bock was asked whether she "conduct[ed] a comprehensive evaluation yourself to determine whether Autumn Rubino suffered from gender dysphoria."  (Bock Dep. 28:8-10, Doc. 62-5.)  Ms. Bock responded that "[b]y July of 2017, I had multiple visits with Autumn Rubino and felt comfortable that she met the criteria set forth in WPATH to begin hormone therapy, yes."  (*Id.* 28:11-14.)  Ms. Bock later confirmed that she herself had made the final diagnosis of gender dysphoria to begin hormone therapy, not just in reliance on Ms. Decker's diagnosis, but in conjunction with the information, and "if she were to be asked pointblank did you diagnose Autumn Rubino with gender dysphoria, you yourself, did you do that?", she would answer "[y]es, I was the

---

[2] "Gender dysphoria" and "gender identity disorder" are different ways of referring to the same condition.  (Zaloga Dep. 44:1-15, Doc. 62-2.)

person." (*Id.* 40:19-41-4.)  She also confirmed that she would stand by the diagnosis in the absence of the information form Ms. Decker.  (*Id.* 41:5-9.)

Plaintiff filed the above-captioned action on June 24, 2018, against numerous Defendants, including Dr. Zaloga and CCI.  (Doc. 1.)  Plaintiff was incarcerated again in October 2018.  (Doc. 63 at 11.)  Plaintiff asserts that she was back on her medications between May 2018 and her re-incarceration.  (*Id.* (citing Pl.'s Dep. at 25, Doc. 62-1).)  During this time, Plaintiff was prescribed the gender-dysphoria related hormone medications by Alder Health physician Joshua Fleetman, M.D., (*Id.* (citing Fleetman Dep. at 58-59, Doc. 62-2).)  Dr. Fleetman relied on CRNP Bock's diagnosis and confirmed at his deposition that there was not "any doubt in his mind [when he treated Plaintiff] that she suffered from gender dysphoria."  (Fleetman Dep. 61:3-7, Doc. 62-2.)  Dr. Zaloga again refused to provide Plaintiff with the prescribed hormone medications during her re-incarceration.  (Doc. 63 at 12 (citing Pl.'s Dep. at 11, Doc. 62-1).)

As noted above, Plaintiff filed the above-captioned action on June 14, 2018.  (Doc. 1.)  Dr. Zaloga and CCI are the only remaining Defendants.[3]  (Doc. 51 at 2.)  Following dismissal of the state law claim for civil conspiracy in Count IV (*see* Docs. 7, 10, 15), the

_____

[3] By Order of January 2, 2020, all Defendants except CCI, Dr. Zaloga, and John/Jane Doe Medical Staff I-X were dismissed from the action.  (Doc. 51.)  In their supporting brief, Defendants state that "[t]he fictitious defendants, John/Jane Doe Medical Staff I-X have never been named, and the caption has not been amended to include additional Defendants. Accordingly, the only remaining Defendants at this time are [CCI] . . . and Dr. Zaloga."  (Doc. 51 at 2.)  Plaintiff does not dispute this assessment.  (*See* Doc. 63.)

Complaint contains the following claims against Defendants CCI and/or Zaloga: Count I –

Municipal Liability and Civil Rights Violations Caused by Policy in accordance with 42

U.S.C. § 1982 and the VIII and XIV Amendments to the United States Constitution, against

CCI and Dr. Zaloga; Count II – Individual Violations of the VIII and XIV Amendments to the

United States Constitution against Dr. Zaloga; and Count III - Intentional Infliction of

Emotional Distress against Dr. Zaloga.  (Doc. 1 at 11-13.)  The Prayer for Relief includes a

request for punitive damages.  (*Id.* at 13.)

On December 16, 2019, Defendants CCI and Zaloga filed the Motion under

consideration here.  (Doc. 48.)  The Motion is fully briefed and ripe for disposition.

Defendants seek summary judgment in their favor on Counts I-III.  (Doc. 49.)  They also

assert that Dr. Zaloga is entitled to qualified immunity on the 42 U.S.C. § 1983 claims and

Plaintiff's punitive damages claim fails as a matter of law.  (Doc. 49 at 18, 23.)  Plaintiff does

not dispute Defendants' argument that they are entitled to judgment on Count III for

Intentional Infliction of Emotional Distress ("IIED").  (*See* Doc. 63.)  Therefore, summary

judgment in Defendants' favor will be granted on the IIED claim.[4]  The Motion will be denied

in all other respects.

---

[4] This conclusion is not based on a determination of the merits of Plaintiff's IIED claim (Doc. 1 ¶¶ 110-111) or Defendants' argument as to why they are entitled to summary judgment on the claim (Doc. 51 at 21-23).

## III. STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008).  "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact.  *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).  Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists.  *Anderson*, 477 U.S. at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).  "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence."  *Anderson*, 477

U.S. at 255.  Therefore, when evidentiary facts are in dispute, when the credibility of

witnesses may be in issue, or when conflicting evidence must be weighed, a full trial

is usually necessary.

## IV. ANALYSIS

### A. Constitutional Claims

Counts I and II of Plaintiff's Complaint are brought pursuant to 42 U.S.C. § 1983

which states in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C.A. § 1983.  To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that

"(1) ... the conduct complained of was committed by a person acting under color of state law

and (2) ... [that] the conduct deprived the complainant of rights secured under the

Constitution or federal law."  *Sameric Corp. v. City of Philadelphia,* 142 F.3d 582, 590 (3d

Cir.1988).  Here, the first element is not at issue.  Defendants allege only that Plaintiff has

not been deprived of a constitutional right.

Plaintiff asserts that her right to relief in Counts I and II of her Complaint arises under

the Eighth and Fourteenth Amendments to the United States Constitution, i.e., her "Right to

Due Process and Right to be Free from Cruel and Unusual Punishment."  (Doc. 1 ¶¶ 100,

103.)  Because Plaintiff states that she is both a pretrial and post-trial detainee, *see supra*

pp. 1-2 & n.1, the Court will first consider the relevant standard to be applied to her claims.

"The Eighth Amendment's proscription of cruel and unusual punishments is violated

by 'deliberate indifference' to serious medical needs of prisoners."  *City of Revere v. Mass.*

*Gen. Hosp.*, 463 U.S. 239 (1983).  In *Hubbard v. Taylor*, 399 F.3d 150 (3d Cir. 2005), the

Circuit Court explained that "*Bell v. Wolfish*[, 441 U.S. 520 (1979),] distinguishes between

pretrial detainees' protection from 'punishment' under the Fourteenth Amendment, and

convicted inmates' protection from punishment that is 'cruel and unusual' under the Eighth

Amendment."  399 F.3d at 166.  As stated in *Hubbard*, *Revere* "viewed the Eighth

Amendment as relevant to conditions of pre-trial detainees only because it established a

floor.  The Court explained: 'the due process rights of [a pre-trial detainee] are *at least* as

great as the Eighth Amendment protections available to a convicted prisoner."  399 F.3d at

165-66 (quoting *Revere*, 463 U.S. at 244).  *Hubbard* noted that the Third Circuit analyzes a

pretrial detainee's claim for inadequate medical care under the Eighth Amendment

standard: "even though the constitutional protections afforded prisoners and pretrial

detainees against inadequate medical care arise from different textual sources, the

standards governing the provision of medical care to each class are similar."  399 F.3d at

166 n.22 (citations omitted).  Thus, the analysis of Plaintiff's medical care claim is not

affected by whether she is classified as a pretrial detainee or a post-trial convicted inmate.

The Eighth Amendment prohibits prison officials from being deliberately indifferent to an inmate's serious medical needs by "intentionally denying or delaying access to medical care or interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009). "In order to sustain this constitutional claim under 42 U.S.C. § 1983, a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); citing *Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002)).

Defendants state that "for purposes of the instant Motion, [they] concede that gender dysphoria is a serious medical need in the constitutional sense [but] Plaintiff cannot satisfy the subjective component of deliberate indifference." (Doc 51 at 10.) Defendants add that the issue in this case is "whether, at the time of the care at issue, Dr. Zaloga **was aware** that Plaintiff suffered from gender dysphoria." (*Id*.)

A guiding principle in the deliberate indifference inquiry is that, in general, "[d]eliberate indifference is a subjective state of mind that can, like any other form of scienter, be proven through circumstantial evidence and witness testimony." *Pearson*, 850 F.3d at 535 (citing *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (noting that, when

13

"intent becomes critical," it is "important that the trier of fact hear" the defendant's "testimony in order to assess his credibility"); *Campbell v. Sikes*, 169 F.3d 1353, 1372 (11th Cir. 1999) ("[P]laintiffs necessarily must use circumstantial evidence to establish subjective mental intent."); *In re Kauffman,* 675 F.2d 127, 128 (7th Cir. 1981) ("Intent ... must be gleaned from inferences drawn from a course of conduct.")).[5]

In assessing the deliberate indifference prong of an Eighth Amendment medical care claim,

> there is a critical distinction "between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment." *United States ex. rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979). Because "mere disagreement as to the proper medical treatment" does not "support a claim of an eighth amendment violation," *Monmouth Cty. Corr. Inst. v. Lanzaro*, 834 F.2d 326, 346 (3d. Cir. 1987), when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care. *See Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights").

850 F.3d at 535. The deliberate indifference inquiry in an adequacy of care claim involves both a subjective and objective component because "evaluating whether medical treatment is adequate presents an objective question." *Pearson*, 850 F.3d at 535. However, "the deliberate indifference prong of a delay or denial of medical treatment claim involves only

---

[5] *Pearson* considered whether expert testimony is necessary in a deliberate indifference case, specifically in the second prong of the inquiry. 850 F.3d at 535. Though that question is not before the Court, the general guidance provided in the decision is applicable here. However, the Court notes that Plaintiff has provided an expert opinion in this case regarding Plaintiff's gender dysphoria diagnosis, treatment for the diagnosis, and Dr. Zaloga's related conduct. (Expert Report (Pl.'s Ex. G), Doc. 62-7.)

one subjective inquiry—since there is no presumption that the defendant acted properly, it

lacks the objective, propriety of medical treatment, prong of an adequacy of care claim." *Id.*

at 537.  Therefore, all that is needed for a jury to find deliberate indifference in a delay or

denial of medical care claim "is for the surrounding circumstances to be sufficient to permit a

reasonable jury to find that the delay or denial was motivated by non-medical factors." *Id.*

(citing *Durmer v. O'Carroll*, 991 F.2d 64, 68-69 (3d Cir 1993); *United States v. Michener*,

152 F.2d 880, 885 (3d Cir. 1945)).

Upon consideration of the relevant standard of review, the legal framework within

which Plaintiff's claims must be considered, the Statement of Material Facts Not in Dispute

in Support of the Motion for Summary Judgment of Defendants Edward Zaloga, M.D. and

Correctional Care, Inc. (Doc. 49)  and Plaintiff's response thereto (Doc. 62), the Court

readily determines that genuine issues of material fact are in dispute, allegedly conflicting

evidence must be weighed, and the credibility of witnesses are at issue.

By way of example, Plaintiff denies the accuracy of Defendants' statement in the

response to a request for treatment that "Plaintiff did not need medical treatment, the

Lorraine Bock is not a doctor, that Plaintiff did not have the right to elective treatment, and

that, in Dr. Zaloga's medical opinion, the risk of the requested medication far outweighed

the benefits."  (Doc. 49 ¶ 6 (citing Defs' Ex. B, Doc. 49-2).)  Plaintiff responds that

> Plaintiff did need her hormone medications. (Exhibit C at 5, p. 20; Exhibit D at
> 19; Exhibit G at 2). CRNP Bock was qualified to make the diagnosis of Gender
> Dysphoria; a doctor was not required. (Exhibit E at 3, p. 9; Exhibit F at 16, p.
> 59). Defendant Zaloga's opinion was irrelevant because he had no

qualifications in regard to Gender Dysphoria and was dismissing the diagnosis of an expert in that field. (Exhibit E at 5, pp. 14-15; Exhibit B at 7, p. 28). Furthermore, the risk-benefit analysis is for the patient, not the doctor. (Exhibit B at 15, p. 60). Plaintiff was actually given informed consent by prior doctors, as stated in the record. (Exhibit F at 17, pp. 64-65).

(Doc. 62 ¶ 6.)

Plaintiff's citations to the record demonstrate disputes as to material issues in this case, including the foundation of Plaintiff's gender dysphoria diagnosis.  Defendants point to the inadequacy of Ms. Decker's initial diagnosis, the inadequacy of CRNP Bock's subsequent diagnosis, and the inadequate basis for Dr. Fleetman's continuing treatment of the diagnosed condition.  (*See, e.g.*, Doc. 49 ¶¶ 41-44, 46, 50, 51, 57; Doc. 51 at 11-12.) Plaintiff points to evidence including CRNP Bock's deposition testimony regarding her independent diagnosis of gender dysphoria and Dr. Fleetman's deposition testimony regarding his appropriate reliance on his predecessor's records as well as his own professional assessment that the record supported the diagnosis.[6]  (*See, e.g.*, Doc. 49 ¶¶ 16, 40-46; Doc. 63 at 11-12.)

Because Dr. Zaloga's interpretation of the record and his assertion that he acted appropriately based on his record review are central issues in this case, the parties' disparate assessments of the cited records present disputed issues of material fact and

_____

[6] Notably, Dr. Zaloga relied on the records of Dr. Thomas Hood, a primary care provider who last saw Plaintiff prior to her care at Alder Health, who did not diagnose gender dysphoria.  (*See, e.g.,* Doc. 49 ¶ 68; Zaloga Dep. 80:25-81:2, 82:16-22, Doc. 62-2.)

allegedly conflicting evidence that must be weighed.  Defendants' position regarding

whether Plaintiff had been properly diagnosed with gender dysphoria also presents a matter

of credibility which must be weighed by a jury.  As set out above, deliberate indifference is a

subjective state of mind and, because intent is critical, it is important that the trier of fact

hear Dr. Zaloga's testimony in order to assess his credibility.  *Pearson*, 850 F.3d at 535;

*Durmer*, 991 F.2d at 69.  Thus, summary judgment on Plaintiff's constitutional claim against

Dr. Zaloga in Count II is appropriately denied.[7]

Similarly, Defendants have not shown that they are entitled to summary judgment on

Plaintiff's claim against CCI.  The parties agree that this claim is governed by the standards

set out in *Monell v. Dep't of Social Services*, 43 U.S. 658 (1978).  (Doc. 51 at 19-20; Doc. 63

---

[7]  Defendants contend that this is an adequacy of care claim and Plaintiff maintains that it is a
denial of care claim.  Defendants state that "the summary judgment record reveals that Plaintiff received
continual medical attention and monitoring, as well an investigation into her claimed diagnosis of gender
dysphoria." (Doc. 51 at 8-9.)  Plaintiff states that this is "a case of *complete denial of care* for Gender
Dysphoria.  First and foremost, this was in the form of denying hormone medication" and she did not
receive any treatment other treatment for gender dysphoria. (Doc. 63 at 19.)  Though Defendants correctly
state that "Plaintiff received medical attention and monitoring, as well as investigation into his claimed
diagnosis of gender dysphoria" (Doc. 51 at 8), Defendants' statement does not indicate any recognition of
or treatment for gender dysphoria.  Rather, the record shows that Plaintiff had been diagnosed with gender
dysphoria and ordered hormone medication and Defendants denied that Plaintiff suffered from gender
dysphoria.  Thus, this case fits more in the denial-of-care category.  However, the Court's conclusion that
summary judgment is not appropriate on Plaintiff's constitutional claim against Dr. Zaloga would be the
same under the more deferential adequacy of care standard because the record does not establish the
objective adequacy of Dr. Zaloga's consideration of Plaintiff's alleged gender dysphoria diagnosis.  *See
Pearson*, 850 F.3d at 535.

at 27-28.)  They further agree that CCI liability depends on whether Plaintiff can show that the alleged constitutional violation was caused by a policy or custom adopted by CCI.[8]  (*Id.*)

Defendants first assert that Plaintiff's failure to establish a constitutional violation is fatal to her claim against CCI.  (Doc. 51 at 20.)  This assertion does not show entitlement to summary judgment because, as discussed above, the issue of whether Defendants acted with deliberate indifference to a serious medical need must in this case, be decided by a jury.

Defendants also argue that summary judgment on the claim against CCI is appropriate because

> there is simply no evidence in the record to support a finding that a policy, practice, or custom caused any violation of Plaintiff's rights.  The record in this case is clear that Dr. Zaloga followed an appropriate procedure to obtain records and evidence to investigate Plaintiff's claimed diagnosis of gender dysphoria, and evaluated Plaintiff's request for hormone medications on an individualized basis based upon those records.

(Doc. 51 at 20.)

As set out above, disputed issues of fact arise in conjunction with Dr. Zaloga's evaluation of Plaintiff's claimed diagnosis of gender dysphoria.  Defendants do not address Plaintiff's assertions regarding the lack of policy addressing the unique medical needs, including hormone treatment, for transgender inmates, and that other inmates had been

---

[8] According to Plaintiff's Complaint, Edward Zaloga, D.O., "owns, operates, controls, maintains, and is President of [CCI]."  (Doc. 1 ¶ 12.)

denied appropriate treatment.  (*See* Doc. 63 at 29.)   Thus, Defendants have not shown

entitlement to summary judgment on their claim against CCI.

## B. Qualified Immunity

Defendants assert that Dr. Zaloga is entitled to qualified immunity.  (Doc. 51 at 14.)

The Court concludes that Defendants have not made the requisite showing.

In *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 211 L. Ed. 2d 164, 2021 WL 4822662

(2021), the Court stated that

> "Qualified immunity attaches when an official's conduct does not violate clearly
> established statutory or constitutional rights of which a reasonable person
> would have known." *White v. Pauly*, 580 U. S. ——, ——, 137 S.Ct. 548, 551,
> 196 L.Ed.2d 463 (2017) (*per curiam*) (internal quotation marks omitted). A right
> is clearly established when it is "sufficiently clear that every reasonable official
> would have understood that what he is doing violates that right." *Mullenix v.
> Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (*per curiam*)
> (internal quotation marks omitted). Although "this Court's case law does not
> require a case directly on point for a right to be clearly established, existing
> precedent must have placed the statutory or constitutional question beyond
> debate." *White*, 580 U. S., at ——, 137 S.Ct., at 551 (alterations and internal
> quotation marks omitted). This inquiry "must be undertaken in light of the
> specific context of the case, not as a broad general proposition." *Brosseau v.
> Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (*per
> curiam*) (internal quotation marks omitted).

*Rivas-Villegas*, 2021 WL 4822662, at *7-8.  As noted by Defendants, the Supreme Court

has stated that "qualified immunity 'protects all but the plainly incompetent or those who

knowingly violate the law.'"  (Doc. 51 at 14 (quoting *Malley v. Briggs*, 475 U.S. 335, 341

(1986)).)

Defendants argue that

> [i]t simply cannot be said that every reasonable person in Dr. Zaloga's shoes would have known that his conduct was violative of Plaintiff's rights, nor can it be said that Dr. Zaloga's conduct was "plainly incompetent" or "knowingly" violative of the law. Once again, Dr. Zaloga exercised due diligence in obtaining and reviewing the relevant information related to Plaintiff's alleged diagnosis of gender dysphoria, and upon determining that there was an utter lack of evidence of such a diagnosis, made a medical decision that the risks associated with the requested treatment outweighed the benefits.

(Doc. 51 at 14-15.)

Defendants' qualified immunity argument hinges on the propriety of Dr. Zaloga's conduct related to Plaintiff's claimed diagnosis of gender dysphoria. Because the Court has found that there are issues of fact and credibility related to this conduct, the argument supporting the claimed entitlement to qualified immunity is without foundation. Therefore, on the current record, it cannot be definitively said that Dr. Zaloga was not "plainly incompetent" or that he did not "knowingly violate the law." *Malley* 475 U.S. at 341. Nor can it be determined that reasonable doctors would not have understood that the denial of care in this case violated a constitutional right. *Mullenix*, 577 U.S. at 11. Accordingly, the Court cannot conclude that Dr. Zaloga is entitled to qualified immunity.[9]

---

[9] Plaintiff's opposition brief lists numerous appellate and district court cases in support of the proposition that "[c]ourts across the nation are routinely holding that failure to treat gender dysphoria is a constitutionally cognizable claim to such an extent that the right to treatment is clearly established." (Doc. 63 at 25.) Defendants do not respond to this argument in their reply brief. (*See* Doc. 64.)

## C. Punitive Damages

Finally, Defendants argue that Plaintiff's claim for punitive damages fails as a matter of law.  (Doc 51 at 19.)  Recognizing that, "[i]n the context of a deliberate indifference claim, punitive damages can be awarded where the 'defendant's conduct is shown to be motivated by an evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others'" (Doc 51 at  (quoting *Alexander v. Riga*, 208 F.3d 419, 430-31 (3d Cir. 2000)), Defendants assert that the record cannot support any such finding here (*id.* at 19).  Specifically, Defendants aver that "the record shows that Plaintiff's alleged diagnosis was carefully and thoroughly investigated by Dr. Zaloga, and that a decision regarding his request for hormone medications was carefully considered and rendered based upon an assessment of the risks and benefits of the treatment at issue."  (*Id.* at 20.) Given the Court's determination that issues of fact and credibility preclude summary judgment on Plaintiff's constitutional claims, the Court cannot agree that the record inarguably shows that Dr. Zaloga carefully and thoroughly arrived at his decisions regarding Plaintiff's gender dysphoria diagnosis and treatment requirements.  Therefore, any decision on Plaintiff's entitlement to punitive damages would be premature.

## V. Conclusion

For the reasons discussed above, Defendants Correctional Care, Inc. a/k/a Correctional Care, PC's and Dr. Edward Zaloga's Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56 (Doc. 48) will be granted in part and denied in part.

The Motion will be granted insofar as summary judgment is warranted in favor of

Defendants on Plaintiff's IIED claim.  The motion will be denied in all other respects.  A

separate Order will be filed with this Memorandum Opinion.

Robert D. Mariani
United States District Judge